UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

STEPHEN GOODLET and
TIFFANY GOODLET,

           Plaintiffs,

     v.                                          Case No. 20-C-1257

OFFICER DERRIK MAYE and,
CITY OF MARINETTE,

           Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

      Plaintiffs Stephen Goodlet and Tiffany Goodlet bring this action pursuant to 42 U.S.C. § 1983 against Defendants Officer Derrik Maye and the City of Marinette. This action arises from an incident in which Officer Maye shot the Goodlets' dog while responding to a 911 hang-up call on August 17, 2017. Defendants filed a motion for summary judgment on August 27, 2021. For the following reasons, the motion will be granted and the case will be dismissed.

## LEGAL STANDARD

      Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)

(citations omitted). "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the videotape." *Id.* at 378–81. Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**FACTUAL BACKGROUND**

The Goodlets live in a trailer on Lot 675 at the Golden Sands Trailer Park, 3400 Pierce Avenue in Marinette, Wisconsin. Defs.' Proposed Findings of Fact (DPFOF) ¶ 10, Dkt. No. 16. At the time of the incident, the Goodlets owned a chocolate lab, a cat, and a chihuahua. *Id.* ¶ 9. On August 17, 2017, Ms. Goodlet left home around 2:30 p.m. *Id.* ¶ 12. Although she thought that both her 9-year-old daughter and 14-year-old son were home, her son had left the residence. *Id.* ¶¶ 12–13. As a result, her daughter was home alone. *Id.* ¶ 13. At around 4:00 p.m., her daughter dialed 911 from the Goodlets' landline and hung up. *Id.* ¶ 14. The Marinette police called back,

and someone at the Goodlet residence picked up the call but hung up. The next return call went to the Goodlets' voicemail. *Id.*

On the day of the incident, Derrik Maye was a police officer with the City of Marinette, Wisconsin. *Id.* ¶ 1. Officer Maye was dispatched around 4:00 p.m. and arrived at the Goodlet residence to investigate the 911 call and subsequent hang-ups at approximately 4:08 p.m. *Id.* ¶ 15. Sometime between making the 911 call and Officer Maye's arrival, the Goodlets' daughter left the home, so there was no one inside the residence. *Id.* ¶ 16.

Officer Maye parked his marked squad car on a road that runs perpendicular to the Goodlets' residence. *Id.* ¶ 18. A recording from Officer Maye's dash cam shows that, after parking his vehicle, Officer Maye walked to the Goodlets' lot. *Id.* ¶ 24. Upon reaching the lot, Officer Maye paused on the Goodlets' concrete driveway to run the plates of a red car that was parked, backed in, on the west side of the driveway. *Id.* ¶ 25. After running the plates of the red car, Officer Maye approached the front entrance of the Goodlet residence by walking completely across the concrete driveway to a concrete pad between the driveway and the front steps. *Id.* ¶¶ 27–28.

According to Defendants, Officer Maye heard barking coming from the residence and first saw the Goodlets' full-grown chocolate lab when the storm door was pushed open and the dog came out of the door. *Id.* ¶¶ 4, 29–30. The dog weighed between 110 and 130 pounds and stood about three feet on all fours. *Id.* ¶ 4. Immediately after the door opened, the dog came down the steps and quickly approached Officer Maye, who stood on the concrete pad located between the garage and the residence. *Id.* ¶¶ 32–34. Officer Maye observed that the dog's hair was standing up in the center of its back and its ears were pinned back, which he interpreted as a sign that the dog was a threat. *Id.* ¶¶ 35, 37. The dog lunged at Officer Maye by rearing up on its hind legs and raising its front paws off the ground and contacted Officer Maye's thighs. *Id.* ¶ 38. As Officer Maye interacted with the dog, the dog's mouth was open. *Id.* ¶ 39. Officer Maye believed that

3

the dog was trying to bite him because it lunged at him with its mouth open, was barking and growling in a low tone, had its hair on end, and advanced at him quickly and consistently. *Id.* ¶ 40. Officer Maye attempted to move away. *Id.* ¶ 41. As the dog advanced and lunged at Officer Maye, Officer Maye stuck out his left hand to grab the dog by the neck, pushed the dog down, and yelled "hey." *Id.* ¶ 42. The dog then lunged at Officer Maye again, who used his left hand to fend off the dog. *Id.* Officer Maye used his right hand to draw his service weapon, which was located on the right portion of his service belt, and fired one shot at the dog. *Id.* ¶¶ 43, 45. The dog was five feet or less away from Officer Maye when it was shot. *Id.* ¶ 46. After Officer Maye shot the dog, it ran north toward the rear of the trailer. *Id.* ¶ 50. Officer Maye did not chase after the dog after he shot it. *Id.* ¶ 51.

Todd Smotucha claims he witnessed the incident from the window of his mother's trailer at Lot 217 at the Golden Sands Trailer Park. *Id.* ¶ 53. Lot 217 is six lots away from Lot 675, which, to repeat, is where the Goodlets' home is located, and around the corner, as depicted in the diagram below:



Dkt. No. 18-11. According to Smotucha, once Officer Maye was in the driveway, the dog slowly walked out from the side of the garage. DPFOF ¶ 57. Officer Maye stood in the middle of the driveway waiting for the dog to get a little closer to him, took out his revolver, and then, when the dog was ten feet away, shot it. *Id.* ¶¶ 54–55, 67. The dog took off after being shot, and Officer Maye chased the dog. *Id.* ¶ 64. Smotucha indicated that the dog did not show aggressive behavior and that Officer Maye did not yell at or try to scare the dog. Pl.'s Proposed Finding of Fact (PPFOF) ¶ 2, Dkt. No. 22; DPFOF ¶ 58. Smotucha could not tell whether the dog's mouth was open or whether its hair was on end. DPFOF ¶¶ 71–72.

The evidence in the record contradicts Smotucha's version of events. As an initial matter, Smotucha's recollection of the incident is inconsistent with the dash cam footage. Although the recording shows a red car parked in the driveway, Smotucha was adamant that there was not a car parked in the driveway when the incident occurred and that Officer Maye could not have stood in the middle of the driveway if the car was there. *Id.* ¶¶ 74–75. Smotucha maintained that Officer Maye stood in the middle of the driveway and waited for the dog to approach him, but Smotucha conceded that the dashcam video shows Officer Maye moving off of the driveway and toward the Goodlets' storm door. *Id.* ¶ 80. At no point during the recording of the incident did Officer Maye stand in the middle of the driveway, wait for a dog to approach him, and shoot. Though the dash cam footage shows a white truck that drove past the Goodlet residence seconds before the Goodlets' door opened, Smotucha stated that he did not observe the white truck. *Id.* ¶ 73. In addition, although Smotucha testified that his view of the incident was not obstructed, a photograph depicting his view of the Goodlet residence shows that his view would be partially obstructed by a bush and the house in the lot kitty-corner from his residence as well as Officer Maye's parked squad car. *Id.* ¶ 69; Dkt. No. 18-19. As a possible explanation for why Smotucha might be willing to offer a version of the events flatly contradicted by the uncontested video

5

recording, Defendants note that Smotucha has as many as five felony convictions, DPFOF ¶ 76, but of course, that is not material to the Court's decision.

The Goodlets concede that, from his vantage point where he claims to have witnessed the incident, Smotucha could not see the Goodlets' front door from which the dog exited and could not see the walkway or front porch. *Id.* ¶ 78. Moreover, the Goodlets do not dispute that the dog was no more than five feet away from Officer Maye when it was shot, though Smotucha asserts that the dog was ten feet away, *id.* ¶ 46, or that the dog ran away after being shot and that Officer Maye did not chase it, though Smotucha maintains that he did, *id.* ¶ 51.

Approximately five seconds elapsed from the time the dog left the residence until the time Officer Maye shot it, and approximately two seconds elapsed from the time the dog first made contact with Officer Maye until he shot the dog. Pl.'s Resp. to DPFOF ¶ 48; DPFOF ¶ 49. Two city of Marinette police officers, who were dispatched at approximately 4:03 p.m., arrived at the scene at approximately 4:11 p.m. DPFOF ¶ 52. According to the complaint, although the bullet remained lodged in the dog's chest, the dog ultimately passed away as a result of pneumonia in October 2018. Compl. ¶¶ 414–16, Dkt. No. 1.

## ANALYSIS

The Goodlets assert that Officer Maye violated the Fourth Amendment. The Fourth Amendment, which is applicable to the states through the Fourteenth Amendment, provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. To establish a Fourth Amendment violation, the plaintiff must establish that the officer's conduct constituted a seizure and that the seizure was unreasonable. *Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005) (citation omitted). The Seventh Circuit has recognized that "the killing of a companion dog

6

constitutes a 'seizure' within the meaning of the Fourth Amendment." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (citations omitted).

Defendants do not dispute that the shooting is a seizure and instead assert that the non-fatal shooting of the Goodlets' dog was reasonable. Determining whether a seizure is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted). In applying this standard, the court must judge reasonableness "from the perspective of a reasonable officer on the scene" and consider "the facts and circumstances of each particular case." *Id.* at 396–97. "Both common sense, and indeed Wisconsin law, *see* Wis. Stat. § 174.01(1), counsel that the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Viilo*, 547 F.3d at 710 (citation omitted). While "the bond between a dog owner and his pet can be strong and enduring," the government's interest is heightened when the dog runs at large, "unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance." *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205–06 (4th Cir. 2003); *see also Bletz v. Corrie*, 974 F.3d 306, 309 (3d Cir. 2020) ("[T]he state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger." (internal quotation marks and citation omitted)); *Hansen v. Black*, 872 F.3d 554, 559 (8th Cir. 2017) ("A dog owner's protected property interest wanes if her pet escapes.").

In this case, no reasonable jury could find that Officer Maye acted unreasonably in shooting the dog. The record shows that Officer Maye was the first officer to arrive at the Goodlet residence to investigate the 911 call and subsequent hang-ups. As Officer Maye walked to the front door, he heard barking. Then, the storm door was pushed open and the 130-pound dog ran down the

7

steps and quickly approached Officer Maye, who was standing on the concrete pad between the garage and the home. The dog's hair was raised, its ears were pinned back, and it lunged at Officer Maye with its mouth open. Although Officer Maye tried to back away and used his left arm to try to push the dog away, the dog continued to leap at him. Based on this evidence, the uncontrolled and unsupervised dog posed an immediate threat to Officer Maye's safety, and Officer Maye shot the dog to prevent it from attacking him.

The Goodlets attempt to create a dispute of material fact as to whether the dog acted aggressively by citing the affidavit and deposition testimony of their neighbor, Todd Smotucha. Smotucha claimed that Officer Maye stopped in the middle of the driveway, raised his weapon, patiently waited for the dog to be in range, and then shot the dog. His version of events is contradicted by the evidence in the record, however. After reviewing the dash cam footage, at no point during the incident did Officer Maye stand in the middle of the driveway, wait for a dog to approach him, and shoot. Smotucha concedes that he could not see the Goodlets' front door, the walkway, or the front porch, the areas where the recording shows the incident between Officer Maye and the dog actually occurred. Given that Smotucha did not clearly see the interaction and admits that he did not see the dog exit through the door and approach Officer Maye on the concrete pad, his statements about the dog's behavior are insufficient to create a genuine issue of material fact as to whether the dog was aggressive and posed an imminent threat to Officer Maye when it was shot.

In sum, Officer Maye acted reasonably in shooting the dog, who presented an imminent threat to his safety. *See Viilo*, 547 F.3d at 711; *see also Bletz*, 974 F.3d at 310 (holding that "the use of deadly force against a household pet is reasonable if the pet poses an imminent threat to the law enforcement officer's safety, viewed from the perspective of an objectively reasonable officer"); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016) ("Thus, the

8

standard we set out today is that a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety."). Accordingly, no Fourth Amendment violation occurred, and the Goodlets' claim against Officer Maye must be dismissed. The Goodlets also assert a municipal liability claim against the City of Marinette. Because the claims against Officer Maye are dismissed, the claims against the City must be dismissed as well.

## CONCLUSION

For these reasons, Defendants' motion to dismiss (Dkt. No. 14) is **GRANTED**. The case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 26th day of October, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
